Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 01 C 1048 | DATE | June 7, 2001 |
| CASE TITLE | Board of Trustees v. Michael Vorkapic, Inc. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] The court finds that the defendants are in contempt of the preliminary injunction [ ] by operating a bricklaying enterprise which is an alter-ego of the defendants' business. The plaintiffs are asked to file a proposal identifying appropriate sanctions by June 19, and the defendants may respond by June 26, 2001. ENTER MEMORANDUM OPINION.

(11)    x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | Document Number |
|---|---|---|---|
| | No notices required. | number of notices | |
| X | Notices MAILED by judge's staff. | JUN 0 8 2001 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | ED-7 FILED FOR DOCKETING docketing deputy initials | 26 |
| | Mail AO 450 form. | 01 JUN -7 PM 3:01 | |
| | Copy to _____ | date mailed notice | |
| KAM | courtroom deputy's initials | Date/time received in central Clerk's Office | KAM mailing deputy initials |

(Reserved for use by the Court)

01-1048.011-MEV                                          June 7, 2001

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| BOARDS OF TRUSTEES OF THE BRICKLAYERS LOCAL 74 FRINGE BENEFIT FUNDS and BOARDS OF TRUSTEES OF THE BRICKLAYERS LOCAL 56 FRINGE BENEFIT FUNDS,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL J. VORKAPIC, INC., a dissolved Illinois Corporation, and MICHAEL J. VORKAPIC, Individually and d/b/a MICHAEL J. VORKAPIC, INC.,<br><br>Defendants. | DOCKETED<br><br>JUN 0 8 2001<br><br><br>No. 01 C 1048 |

## MEMORANDUM OPINION

Before the court is the plaintiffs' motion for Issuance of an Order for Rule to Show Cause, which argues that the defendants should be found in contempt of the preliminary injunction the court entered on February 27, 2001. For the reasons stated below, we find that the defendants are in contempt of the preliminary injunction.[1]

---

[1] We impliedly granted the plaintiffs' motion prior to conducting the evidentiary hearing, which all parties understood to be a hearing on whether or not the defendants were in violation of the preliminary injunction. Although the parties' subsequent briefs continue to be styled as briefs in support or opposition to the Motion for Issuance of an Order for Rule to Show Cause, they both argue the ultimate question before the court – that is, whether the defendants are indeed in contempt, not whether this court should issue an order for rule to show cause. See also infra note 2.

## BACKGROUND

The plaintiffs are fiduciaries and plan sponsors of fringe benefit funds ("funds") for a union, the International Union of Bricklayers and Allied Craftsmen ("Bricklayers"), Local 74 and Local 56. Defendant Michael J. Vorkapic, Inc. ("MKI") was a bricklaying business incorporated in 1995. The owner of MKI was defendant Michael Vorkapic.

In 1995, Vorkapic signed a collective bargaining agreement ("CBA") on behalf of MKI with the Illinois District Council No. 1 ("District Council") of the Bricklayers union, which included Local 74 and Local 56, among others. According to the CBA, the defendants were required to make contributions to the funds on behalf of employees performing bricklaying or bricklaying-related work. The defendants failed to make the requisite contributions a number of times, and the plaintiffs initiated at least two lawsuits to compel compliance. MKI dissolved at the end of 1999, but Vorkapic continued to operate his bricklaying business under that name until the end of January, 2001. Vorkapic signed another CBA with the District Council in May of 2000. Vorkapic has not made the requisite fund contributions since May of 2000. Aff. of Joette Higgs.

The plaintiffs filed suit against the defendants on February 15, 2001, alleging that the plaintiffs suffer irreparable harm by

the continuing failure of the defendants to make fund contributions. They argue that the defendants' actions threaten the actuarial soundness of the pension funds and threaten to deprive the beneficiaries of the welfare funds of medical benefits. On February 22, the plaintiff made a motion for a preliminary injunction, which this court granted on February 27. Among other things, the preliminary injunction (1) enjoined the defendants from violating the terms of the CBAs by failing to make timely contributions to the funds; (2) ordered the defendants to pay all delinquent contributions to the funds and to resume making the contributions on a timely basis; and (3) prohibited the defendants from performing "any further bricklaying or related work in the geographic jurisdiction of the Illinois District Council No. 1 of the ... Union of Bricklalyers (sic) ... until they have complied with the terms of paragraphs 1 and 2."

On March 12, 2001, the plaintiffs filed the instant motion, arguing that the defendants are in contempt of paragraph three of the preliminary injunction because they are performing bricklaying work within the geographic jurisdiction of the District Council. The plaintiffs submitted photographs of a work site where the defendants' equipment was being used in a bricklaying operation and the affidavit of an individual who observed Vorkapic at the work site. Vorkapic submitted an affidavit stating that he is now employed by J-A-M Masonry, Inc. ("JAM"), another bricklaying

company, and is not in violation of the preliminary injunction. The court scheduled an evidentiary hearing to determine whether the defendants were in violation of the preliminary injunction.

The evidentiary hearing was held on March 21, 2001. Vorkapic testified that MKI went out of business at the end of January, 2001. Transcript of the Evidentiary Hearing ("Tr.") at 8. He is now employed by JAM, a bricklaying business incorporated on February 1, 2001. Vorkapic described his job duties at JAM as "estimating, sales and helping [Perea] get started," for which JAM pays Vorkapik $1200 per week. Tr. at 5, 43. The owner of JAM is Efrain Perea, a former employee of the defendants, who had worked as a laborer starting in 1997. Tr. at 5. Perea began laying brick on a part-time basis about one month before Vorkapic stopped doing business. Tr. at 21, 52.

JAM resembles MKI in a number of ways. When JAM started operations, all of its employees were individuals who had worked for MKI. Tr. at 42. In addition, JAM used most, if not all, of the same equipment MKI had used, including scaffolding, two forklifts, and one or two mortar mixers. Tr. at 38-39, 54-55. JAM did not pay the defendants for the use of this equipment. Tr. at 39, 55. Two days after the evidentiary hearing, the defendants "sold" a fork lift, scaffolding, and two mortar mixers to JAM for $6,600.00. Response, Ex. C.

JAM also works for the same developer that Vorkapic worked for and does so in the same geographic area. From 1995 through 2001, MKI's main source of work was through a developer known as Shodeen. Tr. at 10. Some of MKI's work was concentrated in a subdivision of Gevena, Illinois known as Mill Creek. Indeed, MKI was performing work for Shodeen at Mill Creek when it went out of business at the end of January. Tr. at 11. Pursuant to a request by Vorkapic to Shodeen, JAM took over the jobs at the Mill Creek subdivision in February of 2001. Tr. at 11, 17-19. Apparently, Shodeen awarded the work to JAM on condition that Vorkapic would be working for JAM. Tr. at 21-22.

The plaintiffs argue that JAM is a disguised continuance of MKI, and therefore, the defendants should be held in contempt of the preliminary injunction. The defendants respond that Vorkapic's involvement with JAM is legitimate, and MKI and JAM are completely separate entities.

## ANALYSIS

The question before the court is whether the defendants should be held in civil contempt of the preliminary injunction. See 11A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 2960 at 367-68 (West 1995) (noting that criminal contempt proceedings are generally brought by the government and require notice that the proceedings will be criminal in nature). To prevail, the plaintiffs must prove by clear and convincing evidence

that the defendants violated the preliminary injunction.² <u>Shakman v. Democratic Org. of Cook County</u>, 533 F.2d 344, 351 (7th Cir. 1976); <u>see also</u> <u>United States v. Berg</u>, 20 F.3d 304, 311 (7th Cir. 1994) (referring to contempt of a court order).

According to the plaintiffs, the defendants violated the preliminary injunction by operating a bricklaying business under the name of a different company. They argue that JAM is simply an alter ego of the defendants. "The alter ego doctrine focuses on 'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets.'" <u>International Union of Operating Eng'rs, Local 150 v. Centor Contractors, Inc.</u>, 831 F.2d 1309, 1312 (7th Cir. 1987); <u>Sullivan v. Cozzi</u>, No. 95 C 3227, 1997 WL 392248, at * 2 (N.D. Ill., July 8, 1997). The critical inquiry in the alter-ego analysis is whether there was an "unlawful motive or intent," <u>Centor Contractors</u>, 831 F.2d at 1312, and intent may be inferred from the circumstances of the corporate restructuring. <u>Chicago Dist. Council of Carpenters Pension Fund v. A.F. McCarthy, Inc.</u>, 94 C 6881, 1996 WL 563459, at *5 (N.D. Ill. Sept. 30, 1996). Courts will consider "the amount of respect given to the separate identity of the corporation by its

---

2/ Because the only burden seems to be on the moving party, we question whether the time worn phrase "rule to show cause" is descriptive of what the alleged contemnor is required to do. It appears that he is not required to show that he is not in contempt, but only has to offer whatever defense he has to the movant's proof. Neither party cites nor can we find any Seventh Circuit case discussing the alleged contemnor's burden in a "rule to show cause" proceeding in a civil contempt context.

shareholders," for example, by determining "whether there was a failure in maintaining corporate records, undercapitalization, a commingling of funds or assets or one corporation treating the assets of the other as its own." Id. (noting that courts also consider the degree of injustice visited upon the litigants by respecting the corporate identity). In general, alter egos are found where two enterprises share "substantially identical management, business purpose, operation, equipment, customers, and supervision as well as ownership." Caplin v. Medine's Expo Serv., Inc., No. 94 C 1454, 1996 WL 51214, at *4 (N.D. Ill., Feb. 6, 1996) (citing cases). Meeting each element is not essential to reach a finding that an alter ego relationship exists. See Trustees of Pension, Welfare, and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc., 995 F.2d 785, 789 (7th Cir. 1993).

The plaintiffs argue that the facts in this case are very similar to those presented in Sullivan v. Cozzi, where the court granted summary judgment for the plaintiff on an alter ego theory. See Cozzi, 1997 WL 392248 at *3. There, the court determined that a company known as F & D was virtually a "carbon copy" of Cozzi & Son, a plumbing company that had gone out of business. The court found significant a number of factors. First, the timing of F & D's formation was suspicious - it was formed within one month after Cozzi & Son was found liable for pension contributions and stopped doing business. Second, F & D acquired all of Cozzi &

Son's vehicles, tools and equipment. Third, F & D used Cozzi's vehicles, tools and equipment in the identical business, general residence and commercial plumbing. Fourth, the businesses operated over the same geographic area. Fifth, all the former employees of Cozzi & Son simply became F & D employees after the transfer took place. Finally, the leadership of the new business apparently changed only in name. The president of F & D was Cozzi's daughter, who had no real knowledge of plumbing work, and the vice president was Cozzi's son-in-law, who had only worked in plumbing as a laborer. Neither had a plumbing license, or experience running a plumbing business. Cozzi did the consulting and estimating work for F & D, but he retained no ownership interest in the company. Id. at *1-2; see also Favia, 995 F.2d at 789 (noting that common ownership is not required to find an alter ego relationship).

Here, the same factors are present. By the time MKI went out of business, it was several months behind in making the requisite contributions to the funds. JAM incorporated only a few days after MKI stopped doing business, and picked up Vorkapic's bricklaying operation "without missing a beat." See Cozzi, 1997 WL 392248 at *2 n. 3. JAM began operating with all of Vorkapic's machinery and tools, supplying almost none of its own. Tr. at 38 (JAM had some wheelbarrows and a few planks). JAM uses those tools and equipment in a bricklaying business identical to the one Vorkapic had operated. See Response, at 14 (MKI and JAM "perform essentially

identical services"). When JAM started doing business in February, all of its employees were individuals who had been working for the defendants in January. Moreover, JAM works entirely in the Mill Creek subdivision, which is exactly where MKI had worked until the end of January. Indeed, JAM took over the jobs at the Mill Creek subdivision after the defendants went out of business. MKI had primarily gotten business from Shodeen, and most of JAM's jobs have been for Shodeen. In addition, JAM was also awarded a contract from Jordan Construction in mid-February. Vorkapic had spoken to Jordan prior to February 1st about MKI doing that particular job. Tr. at 22. There was nearly no pause in operations between the two businesses, for JAM began working two weeks after incorporating. Thus, like F & D in Cozzi, JAM "miraculously emerged, like Aphrodite, full grown from the waves." See Cozzi, 1997 WL 392248 at *1.

As to the question of leadership, we infer from the evidence presented that Vorkapic participates in directing JAM's operations. Perea, the new owner of JAM, has virtually no experience as a bricklayer. Perea worked as a laborer for some years, but only began laying brick, on a part-time basis, about one month before JAM incorporated. Tr. at 52. Apart from Perea, the only other JAM supervisor identified by Vorkapic is an individual who was only an apprentice bricklayer when he worked for Vorkapic. Tr. at 37-38.

Vorkapic earns $1200 per week at JAM, but described himself as only peripherally involved in JAM's operations. He disavowed any supervisory responsibility over the business or the employees. In response to the plaintiffs' assertion that he has been observed at JAM's work sites, Vorkapic testified that he spends little time at the work sites, and when he's there he only answers Perea's questions. Tr. at 23. When asked to described his duties, he named "estimating, sales and helping [Perea] get started." Tr. at 5. As to his duties estimating, he stated that "might be [an] intention for the future" and that there is no need for bidding new jobs currently. The only other job duty he mentioned was to help with billing "until [Perea] gets up and running." Tr. at 43. For all his hedging, we believe that Vorkapic's job consists of getting the business running, and to that end, includes consulting, estimating, sales, and billing. As the only individual in the enterprise experienced in operating a bricklaying business, we can easily infer that he plays a leading role.[3] See Cozzi, 1997 WL 392248, at *2 (finding significant that the owner of the former company did consulting and estimating work for the new company, which otherwise lacked experienced leadership).

---

[3] In their brief, the respondents set forth another theory to explain Vorkapic's involvement in the JAM: "Vorkapic simply wanted to get out as a business owner, and JAM is seeking to improve its business prospects by hiring Vorkapic so that it could rely on him for advice and for the goodwill that his name carries in the bricklaying industry." No evidence was submitted to the court at the evidentiary hearing or otherwise regarding Perea's intentions, nor did Vorkapic testify that JAM communicated this purpose to him.

JAM has treated the defendants' assets as its own: JAM used Vorkapic's equipment and machinery without purchasing it or paying any lease charges. See McCarthy, 1996 WL 563459, at *5 ("In assessing whether a transaction is a 'sham' the courts will look to ... the amount of respect given to the separate identity of the corporation by its shareholders."). We find dubious the defendants' contention that JAM bought those assets in an arms length transaction. In an affidavit submitted to the court on March 20, 2001, Vorkapic represented that he had sold unspecified equipment to JAM in January of 2001.[4] However, at the evidentiary hearing Vorkapic testified that JAM had paid nothing for his equipment or the use of it. Tr. at 39, 55 (noting, however, that he had sold Perea a pick-up truck in November of 2000). In their Response brief, the defendants now provide evidence that the equipment was sold two days after the evidentiary hearing. See Response, Ex. C (Bill of Sale). According to the Bill of Sale, MKI sold a fork lift tractor, two mortar mixers, and miscellaneous scaffolding and planks to JAM for $6,600. No evidence has been presented about the negotiations leading to this transaction,[5] about the fair market value of the equipment at issue, or that any

---

[4] In his affidavit, Vorkapic responds to the plaintiff's photographic evidence that his equipment was being used in a bricklaying operation. Apart from a pick-up truck that Perea bought from Vorkapic in November of 2000 and a lift truck leased by MKI, Vorkapic states that "[a]ny and all remaining equipment in the pictures attached to plaintiff's motion was sold to J-A-M Masonry, Inc., in January 2001." The only equipment we can clearly identify in the photographs is scaffolding, but there may be more our untrained eyes cannot discern.

[5] Although the defendants suggested they might wish to re-call Vorkapic as a witness, they have not shown any inclination to do so since the March 21st hearing, nor have they submitted an affidavit from Vorkapic to supplement his testimony.

payment has actually been made by JAM. <u>Cf.</u> <u>Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.</u>, No. 94 C 811, 1994 WL 692726, at *7 (N.D. Ill. Dec. 1, 1994) (denying summary judgment for the plaintiff and noting evidence that showed two companies at issue were sold for fair market value). We see this belated transaction as an attempt to cloud the evidence and to reconcile Vorkapic's inconsistent statements.

The defendants concede that commingling of funds is a tell-tale sign of alter-ego liability, but argue that no such commingling occurred here. JAM banks at a different institution than the defendants, and Vorkapic is not an authorized signer on JAM's accounts. This may be true, but the proof that corporate formalities went unobserved is that JAM began operating with Vorkapic's equipment, tools and machinery nearly two months before they were "sold." <u>See</u> <u>Central States, Southeast and Southwest Areas Pension Fund v. Sloan</u>, 902 F.2d 593, 597 (7th Cir. 1990) (finding significant that the assets of the former business were transferred to a new business without any money changing hands).

The defendants' citation to <u>Chicago District Council of Carpenters Pension Fund v. Vacala Masonry, Inc.</u>, 967 F. Supp. 309 (N.D. Ill. 1997) does not advance their position. In <u>Vacala</u>, the court rejected the plaintiff's assertion that because the two companies at issue shared some equipment they had an alter ego relationship. <u>Id.</u> at 319. The court found that the two companies each had their own equipment; sharing only occurred "occasionally" when one company leased employees to the other. <u>Id.</u> at 312. The

opposite is true here. When JAM started operating, it had no equipment except for wheelbarrows and a few planks. See also McCarthy, 1996 WL 563459, at *5 (identifying under-capitalization as another factor in the alter ego analysis). It depended entirely on the use of the defendants' fork lifts, scaffolding, and mortar mixers to run its business. Moreover, it is undisputed that JAM paid nothing for using Vorkapic's equipment in the period between February 1 and March 23, 2001.

The circumstances of the transfer of operations from MKI to JAM also convince us that the defendants' action was motivated, at least in part, by an intent to avoid fringe benefit obligations. At the time of the transfer, the defendants owed several months of contributions to the funds, and were not entitled to terminate the CBA until May of 2004. Vorkapic had been sued two or three times for failing to make the requisite contributions. Tr. at 36. Not surprisingly, his testimony at the hearing suggested some animus toward the union. The only thing Vorkapic told Perea about the union was that he had had "nothing but ... trouble trying to keep up and pay." Tr. at 52. When a union business agent appeared on JAM's job site, Vorkapic told the agent he was not welcome. Tr. at 47. Taken with the other evidence, these circumstances support the inference that the former business was closed because of an inability to pay prior contributions and the new business was formed to avoid the future payment of contributions to the funds required by the CBA.

The defendants highlight differences between the two companies in an effort to show that they are separate and distinct entities. For example, JAM has employees who did not work for the defendants, and JAM and MKI do not use the same office location or telephone number. As to the first contention, Vorkapic testified that when JAM started operating, all of JAM's employees had been employed by the defendants. Tr. at 42. JAM hired other employees only after the takeover. Evidence that a new business has "become increasingly independent and diversified since its founding," is not sufficient to negate an alter-ego relationship where the court finds an intent to avoid union obligations and an interrelation of operations. See Sloan, 902 F.2d at 598 (noting that the two businesses had different leadership and the new business had obtained more customers). As to the use of different offices, this is a small difference in operation that is insufficient to overcome the other evidence. Finally, as mentioned earlier, common ownership is not required to find an alter-ego relationship. See Favia, 995 F.2d at 789; Cozzi, 1997 WL 392248 at *1-2.

## CONCLUSION

We find that the defendants are in contempt of the preliminary injunction by operating a bricklaying enterprise which is an alter-ego of the defendants' business. A court may impose sanctions for civil contempt "to coerce obedience to a court order or to compensate the complainant for losses sustained as a result of the

contumacy." <u>Berg</u>, 20 F.3d at 311. Reasonable attorney fees related to a civil contempt proceeding may also be awarded. <u>BPS Guard Serv., Inc. v. International Union of United Plant Guard Workers of Am., Local 228</u>, 45 F.3d 205, 211 (7th Cir. 1995).

The plaintiffs have not identified what sanction they believe would be appropriate, and we will await their submission of a proposal. In formulating their proposal, the plaintiffs should bear in mind the cautions of <u>New York State Nat. Org. for Women v. Terry</u>, 159 F.3d 86 (2nd Cir. 1998), especially that the sanction should seek to deter future non-compliance rather than to punish prior violations of the injunction. The plaintiffs may file their proposal by June 19, and the defendants may respond by June 26.

DATE:     June 7, 2001

ENTER:    _____
          John F. Grady, United States District Judge